Filed 3/10/21  P. v. Chamberlin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PARKER WILLIAM CHAMBERLIN,<br><br>    Defendant and Appellant. | F078984<br><br>(Kern Super. Ct. No. SC083227A)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Jennifer Oleska, and Cavan Cox, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Parker William Chamberlin was 15 years old when he killed his mother, Tori Knapp, an elementary school teacher, in 2001. Appellant stabbed her 35 times with such force that the tip of the knife broke off in her rib. Appellant called 911 and reported an unknown man was the culprit. After the officers discovered his mother's body in the house, appellant repeatedly gave them a detailed description of the suspect and the suspect's clothing. When officers later confronted appellant with inconsistencies in his story, he admitted he killed his mother, and said he was angry because she owed him money and asked him to do chores. Their family and friends testified Ms. Knapp and appellant appeared to have a close and loving relationship.

In 2002, appellant was tried as an adult and convicted of first degree premeditated murder with personal use of a deadly weapon, a knife. He was sentenced to 25 years to life plus one year. This court affirmed the judgment on appeal.

In 2018, while appellant was serving his prison term, and before he was eligible for parole, the Secretary of the California Department of Corrections and Rehabilitation (CDCR) sent a letter to the Superior Court of Kern County pursuant to Penal Code[1] section 1170, subdivision (d), and recommended recall of appellant's indeterminate sentence. The letter also recommended that appellant be resentenced based on his positive record in prison of good behavior, earning numerous certificates of commendation, establishing mentorship programs for inmates, becoming a substance abuse counselor, continuing his education by earning his high school diploma and working toward a psychology degree, and taking responsibility for his actions.

Thereafter, appellant filed a motion for the superior court to follow CDCR's recommendation and recall his sentence and resentence him by immediately releasing

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

him on supervised probation.  In 2019, after extensive briefing and a lengthy evidentiary hearing, the superior court denied the motion to recall defendant's sentence.[2]

On appeal, appellant argues the court abused its discretion and should have given greater weight to his record of good behavior in prison and not to the crime itself.  We find the court did not abuse its discretion and affirm.

**PART I**

**THE MURDER[3]**

**The 911 call**

Sometime around 3:22 a.m. on July 3, 2001, appellant called 911 from his house and said his mother had just been stabbed.[4]  In response to the dispatcher's questions, appellant said some man did it; he saw the man, but he did not know him.  He stated that the man was wearing black pants and a dark shirt, and he ran out the back door.  Appellant said he came home because he had a "bad feeling," and the man was there.  The dispatcher asked where his mother was.  Appellant said she was in her bedroom and "her phone didn't work."  Appellant said his hand hurt because the man stabbed him.

The dispatcher told appellant to calm down and an ambulance was on the way.  The dispatcher asked appellant for more details about the man.  In response to questions, appellant said he thought the man was wearing a hat.  The dispatcher asked if it was a

---

**2** On May 17 and July 3, 2019, "confidential" augmented clerk's transcripts were filed with this court that contained documents filed by appellant and the district attorney with the superior court in this matter.  On January 12, 2021, without objection from the parties, this court ordered that the documents contained in these two confidential augmented clerk's transcripts shall be treated as nonconfidential, and that we may cite and quote from these documents in order to address the parties' contentions in this appeal.

**3** We hereby grant appellant's request, filed on July 11, 2019, for this court to take judicial notice of the appellate record in *People v. Chamberlin,* F041358.

**4** At the time of the murder, appellant and his mother lived together in the family residence.  Appellant's father died when he was seven years old from a heroin overdose.

3.

baseball cap, and appellant said yes. The dispatcher asked if the man was tall, and appellant said he was about his own height of six feet one inch. The dispatcher asked if he was heavy or thin, and appellant said thin. The dispatcher asked if he saw a weapon or a knife, and appellant said the man had a knife and swung it at him. Appellant said he knocked the knife out of the man's hand, and it hit his own hand. The call ended when appellant said the doorbell was ringing.

**The initial investigation**

At 3:25 a.m., Officers Luera and Cahill were the first officers to arrive at Ms. Knapp's house. Cahill found the side gate was open.

Officer Luera knocked on the front door of the residence and waited there. He heard a man screaming inside the home. Appellant opened the door, and he was extremely upset, crying, and incoherent.

Officer Luera asked appellant what happened, but he did not respond. Luera asked if someone was inside the house, and appellant said his mother was there. Cahill walked in the house and Luera again asked what happened. Appellant said there was a man in the house with a knife.

The officers found Ms. Knapp on the floor of her bedroom. She was dead, had been stabbed multiple times, and there was blood all over her body and the bed.

**Appellant's statements at the scene**

After discovering the body, Officer Luera went back to speak with appellant, and noticed he had a rag wrapped around his right hand and it was stained with blood. Luera again asked appellant what happened. Appellant said there was a man in the house with a knife. Luera asked for a description. Appellant said the suspect was a white male, about six feet two inches tall, muscular, and he was wearing a dark colored, long sleeve shirt, dark pants, and a baseball cap. Appellant said the man ran out the backdoor.

Officer Luera called for an ambulance so paramedics could examine appellant's hand. After their arrival, they checked his hand, and appellant declined medical

4.

attention. Luera then placed appellant in the back of his patrol car. Luera testified appellant was not under arrest, but it was the only safe place for him since he was still upset, and the residence was a crime scene.

Officer Luera talked with appellant while he sat in the patrol car and tried to calm him down. Appellant calmed down slightly, and Luera asked if he could give more information about what happened.

Appellant said he had been at a friend's house when he began to have a bad feeling something happened to his mother, so decided to go home. When he arrived, he noticed the backyard gate was open. He went into the house through the back door, and heard his mother say, " 'Please help me.' "

Appellant said he walked into his mother's bedroom and saw a man standing inside holding a knife. Appellant said he went toward the man to confront him, but the man cut his right hand with the knife. Appellant said he knocked the knife out of the man's hand, and they both fell to the floor. The man jumped up and ran out of the house. Appellant saw his mother was covered with blood.

Appellant said he picked up the knife and then dropped it. He chased the man down the street but lost sight of him. Appellant said he returned home and called the police.

**The crime scene**

At least 10 to 15 officers arrived at the house to investigate the homicide. Detective Donald Krueger was the lead investigator.

Detective Krueger observed appellant while he was sitting in Officer Luera's patrol car that was parked in front of the house. Appellant was wearing shorts, but no shirt or shoes. Appellant had a deep cut on his right hand, and blood droplets on his stomach and chest that appeared to be cast-off blood. Appellant appeared agitated and clearly upset.

In front of the house, there was a bloody, white T-shirt on the sidewalk next to drops of blood. The sprinklers had been on earlier, and there was a layer of water on top of the grass. The water had not been disturbed, and there were no shoe or footprints on the lawn or in the flower beds around the house. There were drops of blood in the driveway. A bloody bath towel was shoved in the trash can at the side of the house. A pair of sandals was outside the back door. A kitchen knife was on the floor of Ms. Knapp's bedroom, and the tip was broken off. The knife appeared to match the knives that were in a knife holder in the kitchen.

Ms. Knapp's naked body was lying on the bedroom floor, and it was covered with blood and knife wounds. There was a large amount of blood on the bed, floor, wall, and ceiling. The top of the nightstand was covered with dried blood.

Detective Krueger testified there were blood drops in an adjacent bathroom that were "circular, indicating to me that they were passive blood drops, which means that the source of the blood was stationary," compared to the blood spatter in the bedroom.

**Forensic evidence**

Criminalist Jeanne Spencer testified there was blood spatter on the bedroom walls, the side of the bed, a chair, the ceiling, and a dresser that was probably sprayed by arterial pressure. There were nine "knife-like cuts" in the bed sheet. The large pool of dried blood on the top of the nightstand indicated that Ms. Knapp got out of bed after being stabbed and stood bleeding over the nightstand before collapsing. The telephone on the nightstand was not plugged into the outlet. There was blood smeared around the telephone's outlet plate, indicating it was unplugged during or after the attack.[5]

The pattern of blood outside the house indicated that someone might have been standing and bleeding at one point. There was no indication that anyone was running and

---

[5] During the 911 call, appellant told the dispatcher that his mother was in her bedroom and "her phone didn't work."

bleeding. There were no signs of forced entry into the house or of any struggle other than in Ms. Knapp's bedroom.

A .357-magnum handgun was in the nightstand next to Ms. Knapp's bed, and a shotgun was in appellant's bedroom. According to Detective Krueger, both firearms would have been heard outside the home if discharged inside Ms. Knapp's bedroom.

There was a note taped on appellant's bedroom door that was written to appellant from his mother, that said: "[I]f you aren't going to clean [your sister's] room, you can consider the $5 I gave you for that your dinner money for tonight. I love and miss you. Do you want to go to Rice Bowl for lunch tomorrow?"[6]

There was a piece of paper taped to the door from the garage into the house, that said: "Mom, Matt and I are going to hang out at his house and order a pizza or something. I'll call you if we do anything else or if I'm going to stay the night. I love you. Call me when you go to bed if I haven't talked to you. Love, Parker."

**Appellant's time at his friend's house**

David Vance, the father of appellant's friend Matt, testified that appellant spent the night with his son three to five times before July 2, 2001. On his prior visits, appellant would always get a ride home when he left. On the night of the murder, Mr. Vance returned to his house around 10:00 p.m. Appellant and Matt were in the spa. Mr. and Mrs. Vance went to bed around 11:00 p.m.

Matt Vance (Matt) testified appellant was a good friend. In his experience, appellant always got along well with his mother, he loved her, and he was never critical or expressed animosity toward her.

Matt picked up appellant around 4:30 p.m. on July 2, 2001, and they spent the afternoon at Matt's house. Appellant's mother called him around 5:30 p.m. Matt could

---

[6] Ms. Knapp's daughter previously lived with the family, but she no longer lived at the residence at the time of the murder.

hear the conversation. Appellant said he was at Matt's house, and there were no problems during the call. After he hung up, appellant said his mother had just gotten home from the movies.

Matt testified appellant was in a normal, happy mood the entire time they were together, and he was not down or depressed. They talked about girls, sports, football, the upcoming school year, and what they planned to accomplish. Appellant did not talk about his mother, having to do housework, or complain about anything. Appellant seemed content and upbeat.

Matt testified that during appellant's prior visits, he would borrow a pair of Matt's shorts to wear after he got out of the spa if he was going to spend the night. If appellant planned to go home, he would put on his own shorts. On the night of July 2, they were in the spa and when they got out, appellant put his own shorts back on and ended up staying overnight, which was unusual.

Around midnight, Matt asked appellant if he wanted a ride home or he was going to stay overnight. Appellant said he was going to stay the night. Matt went to bed around 12:30 a.m. or 12:45 a.m., and he saw appellant get on the couch to sleep.

Mr. Vance woke up around 5:45 a.m. on July 3 and thought someone was sleeping under the blanket on the living room couch. When he approached, he discovered that several pillows had been arranged under the blanket in a manner that resembled a person sleeping.

Appellant's home was 2.1 miles from the Vance residence. An investigator ran that distance in 17 minutes 30 seconds and walked the same distance in 37 minutes.

**The autopsy**

Dr. Donna Brown, who conducted the autopsy, testified there were a total of 35 stab, slash, and incise wounds on Ms. Knapp's body, and a small piece of metal was

8.

lodged in one of her ribs.[7] While the human body normally contains five to six quarts of blood, there was less than one-half cup of blood remaining in her body.

In Dr. Brown's opinion, Ms. Knapp was stabbed with a sharp, single-edged instrument. The location of the various wounds indicated that Ms. Knapp moved, either rotating herself or being rotated, as she was being attacked. Ms. Knapp sustained the wounds rapidly but bled to death relatively slowly over a period of approximately five minutes.

Ms. Knapp had several defensive wounds, including one to her right hand that severed the tendon to the thumb and rendered it useless, and another wound that severed tendons around her left wrist and rendered her unable to use her left hand.

There was a total of nine wounds on Ms. Knapp's face and head in a front-to-back pattern. There were four wounds to the upper chest, neck and shoulder. A wound underneath Ms. Knapp's chin penetrated the fibrous covering of the brain and caused intracranial bleeding. Several stab wounds were found on Ms. Knapp's back, including wounds that penetrated the left lung and chest wall, causing the lung to collapse. The wounds to Ms. Knapp's back also cut arteries and veins, causing substantial blood loss. There were wounds to the lower abdomen, including one that ruptured the abdominal wall and was large enough that about six feet of intestine protruded from her body. Many of the wounds by themselves would have been fatal; the number of wounds was in excess of those needed to kill her.

**Appellant's statements while being driven to the hospital**

In addition to his initial statements to Officer Luera, appellant made subsequent statements to officers in the hours after the discovery of his mother's body.

---

[7] The tip of the knife found in Ms. Knapp's bedroom had been broken off.

While appellant was still sitting in the back of Officer Luera's patrol car in front of his house, he told Luera that his hand was starting to hurt. Luera drove him to the hospital for medical attention while the officers continued to investigate the scene.

During the drive, appellant told Officer Luera that he forgot to say that when he chased the suspect through the house, he grabbed a towel to wrap around his cut hand. After he chased the suspect outside, he threw the towel into a trash can and continued to chase him down the street.

When they arrived at the hospital, Officer Luera asked appellant to give a urine sample, based on a request made by another officer.

**Appellant's statements at the hospital**

Around 9:50 a.m., Detectives Krueger and Adair went to the hospital and met appellant. They advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Appellant agreed to answer questions, and the interview lasted for about one hour. The detectives asked him to explain what had happened.

Appellant said he had stayed at his friend's house the previous night and went to sleep around 1:00 a.m. Appellant woke up and had a bad feeling; he could hear his mother talking to him. He put on his sandals and walked home. He took his shirt off while he was walking. Appellant said when he arrived at his house, he noticed the backyard gate and the backdoor were open. He walked in the house and took off his sandals. The lights were off, and he heard muffled voices from the bedroom. As he approached his mother's bedroom, he heard her say, " 'Please stop.' " He brushed up against the wall and made some noise and saw a man in his mother's bedroom; the man was holding a knife. The man raised the knife over his head and appellant raised his hand to defend himself. The man cut appellant in the hand with the knife and knocked him to the ground. Appellant grabbed the man, and the man stumbled but ran out of the bedroom.

10.

Appellant said he briefly picked up the knife, then put it down. He crawled to his mother, then stood up and went to the bathroom to grab a towel because his hand was bleeding. Appellant ran into the hallway and into the living room, and the man ran out the back door. The man ran on the backyard grass and through the gate. Appellant ran after the man but stopped to throw away the towel in the trash bin. He ran to the street, looked around, and saw the man about 30 to 40 yards away. He ran after him, but he was not wearing shoes. He lost sight of the man and returned to his house.

Appellant said that based on the man's voice, he believed the suspect was a Caucasian male, six feet one or two inches tall, muscular, and wearing a black, long-sleeve shirt, and a dark ball cap with a decal on it. Appellant said the man had a "funny run," like a limp.

Detective Krueger ended the interview when medical personnel arrived to treat the cut on appellant's hand.

**Appellant's statements at the police station**

Around noon, appellant was released from the hospital and Detective Krueger drove him to the police department. At 1:30 p.m., Detectives Krueger and Adair resumed their interview with appellant. It was recorded and played for the jury. Detective Adair asked appellant to again tell them what happened, and appellant repeated his prior story at great length and in detail, over 20 pages of the interview transcript.

The detectives asked appellant if he used steroids. Appellant said a friend gave him "quite a few pills … like 20" that he used for a couple of weeks. He last used pills "probably three months ago. It's been quite a while." He injected "a little bit" of steroids once, and it was "quite a few months ago." Appellant said he worked out a lot and stopped using steroids because they did not do anything for him, and he did not notice any difference "in my strength or anything."

Detective Adair pointed out several problems in appellant's story and said it did not make sense compared to the evidence they found in the house. Appellant asked,

11.

"Such as what?" Adair said that under appellant's story, he confronted the suspect and knocked him down, the man dropped the knife and ran out of the bedroom, appellant checked his mother, got up from the floor, went into the bathroom to stop the bleeding in his hand, and the man was still in the house because appellant said he saw him run out the back door. Adair asked why the suspect would stick around. Appellant said that maybe the man was waiting, and he did not know. The detectives asked for the truth. Appellant said everything happened fast and stayed with his story.

The detectives said they thought appellant was heavily taking steroids and asked whether the steroids had an effect on him like "roid rage" that made him aggressive. They asked him to tell the truth.

### Appellant's confession

The detectives again asked him what really happened, and Detective Adair asked if he killed his mother. Appellant said he did not know. The detectives encouraged appellant to tell them what happened and take his time. Appellant asked, "What's gonna happen to me?"

Detective Adair said they did not know exactly why it happened, but they knew he killed his mother, and appellant said yes. Adair asked what happened. Appellant said he was at his friend's house and "something just hit me," and he walked home. He took off his sandals and left them outside because they made noise, but also claimed he took them off because he got a blister while he walked home. He also took off his shirt and either left it with his sandals or on the couch. He unlocked the back door and went into the house. He was not in the house for long before he decided to stab his mother. He took the knife from the kitchen and went into his mother's bedroom, where she was asleep. He started to stab his mother through the bedcovers. He did not remember how many times he stabbed her, but she said to please stop. She rolled out of bed, and he panicked; he could not believe what he had done. He accidentally cut his hand with the knife. He thought everything happened around 3:00 a.m.

12.

Appellant was asked what he was thinking when he grabbed the knife. Appellant said he was thinking that he wanted to hurt someone, and how she owed him money for doing chores. He initially said she owed him $80, and later said it was closer to $60. Appellant saw the note that his mother put on his bedroom door but did not read it. He was also upset because she asked him to do household chores. He argued with her when she asked him to unload the dishwasher, and she told him he could not be slacking.

Appellant said he threw away the bloody towel, got his stuff, and started to walk back to his friend's house. He was going to claim that he cut himself with a knife when he was getting a glass of water at Matt's house. He was bleeding too much and realized he would need stitches. He wrapped his shirt around his hand to stop the bleeding. He went back to his house and called 911.

Appellant said that when he first left Matt's house, he did not know what he was going to do. Appellant admitted the idea of killing his mother "definitely wasn't" something that came to him on the spur of the moment, but claimed he decided to do it while he was walking home. He grabbed the knife because it was the first thing that came to mind. He was thinking of the bad things about his mother. He went to his mother's room and began stabbing her through the covers and kept stabbing her as she moved and when she fell onto the floor.

The detectives asked appellant if there was anything else that they should know about what happened. Appellant said:

> "All … my life I have, uh, you know, I strive to be the best I can be – an, uh – she did so much for me and, uh, I know – if I could take it back I would do – I would take it back in a second. In a heartbeat. Less than a heartbeat. If I could take her place I would in a second. She was a great person…. I don't know how I'm gonna face my family. I don't know how I'm gonna face my friends."

The detectives ended the interview. Appellant was arrested and held in juvenile hall.

## Stipulation about negative steroid tests

Detective Krueger testified that when he met with appellant, he initially suspected appellant could be under the influence of a central nervous stimulant because his pupils were dilated, he was licking his lips, and his behavior was agitated. Krueger asked appellant about steroids, and appellant said he last took them one or two months earlier.

At appellant's trial, the parties agreed to the following stipulation that was read to the jury:

> "While be[ing] treated for his injuries at Kern Medical Center on the morning of July the 3rd, 2001, [appellant] submitted a sample of his urine for analysis. During a physical examination later the same morning, [appellant] submitted a sample of his blood for analysis. The blood and urine samples were collected and analyzed in a scientific and medically approved manner. The results of the analysis of the submitted samples are recorded as follows: Number 1, negative for alcohol; Number 2, negative for steroids; Number 3, negative for drugs or narcotics. [¶] It is further stipulated that the chain of custody regarding the blood and urine samples are complete and have not been mishandled."

## Additional stipulation

The parties also stipulated that in the fall of 2000, appellant obtained his mother's ATM card and withdrew approximately $1,200 without her permission. In 2000, appellant possessed a small amount of marijuana, which he intended to sell to a friend.

## Defense evidence

Appellant did not testify at his trial.

Defense witnesses testified that Ms. Knapp and appellant appeared to have a close and loving relationship, even after appellant took her ATM card and stole $1,200 from her bank account. When Ms. Knapp found out, she took away appellant's privileges and placed him on restriction, which made him unhappy.

Patricia Wonderly, who taught at the same elementary school with Ms. Knapp, testified they were best friends and went to the movies together the night before she was killed. Wonderley saw appellant every day when he attended the school, and he was a

14.

straight A student and student body president. Appellant and his mother had a warm and close relationship, and they never fought. She knew appellant stole Ms. Knapp's ATM card and withdrew money from her account. Ms. Knapp was not happy about it. She put appellant on restriction and made him work to repay the money. There was no animosity between Ms. Knapp and appellant, and they maintained their good relationship.

Elizabeth Williams, appellant's paternal grandmother, similarly testified appellant and Ms. Knapp were very close, and they never fought. Ms. Knapp was very generous with appellant, and he loved her. She knew about the ATM incident and described it as "teenage idiocy."

Deborah Vigstorm, Jeff Reller, and Don Lundgren were appellant's high school teachers the year before the murder. They testified he was motivated, mature, responsible, organized, extremely intelligent, fun and upbeat, popular and well liked. He spoke highly of his mother. He was an excellent student in the GATE (Gifted and Talented Education) program and was in the top one percent of his class.

Appellant's teenaged friends described him as ambitious and goal oriented, very intelligent, popular, and respectful. He appeared to have a special relationship with his mother and genuinely loved her. He never complained or expressed anger about his mother.

Ivan Champlin had been a teacher at juvenile hall for 27 years. By the time of trial, appellant had been in his class for about one year. Champlin testified appellant was the most intelligent student he ever had. He was very bright and motivated, got along well with and assisted other students, and could calm down other juveniles.

## PART II

## PROCEDURAL BACKGROUND

On September 19, 2001, a complaint was filed that charged appellant with count 1, first degree premeditated murder (§§ 187, subd. (a), 189), and that he personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)).

15.

**The juvenile fitness hearing[8]**

In September 2001, Judge Stuebbe conducted a hearing to determine whether appellant was amenable for treatment in the juvenile system.[9] The primary witness was Dr. Phillip Bronner, a child psychiatrist who had met with and evaluated appellant. Appellant told Dr. Bronner that he started using steroids in the beginning of April 2001, because he hoped to make the varsity team in the fall football season. Appellant said he used both pills and intramuscular steroids that he injected. He followed a schedule that his supplier gave him. He stopped using steroids around the first week of June 2001. After not using for 10 days, he started using again for a week or 10 days more. Appellant said he felt a sense of rage growing in him when he was using steroids and was afraid that he would lose control of himself.

Dr. Bronner testified the police found injectable steroids and a syringe in appellant's bedroom. Dr. Bronner acknowledged that in his pretrial statements, appellant told the police that he had not used steroids for more than one month before the July 2001 homicide.

Dr. Bronner testified that in his opinion, appellant committed the murder while he was in a psychotic state precipitated from using steroids. While steroids were not found in his system, Dr. Bronner believed steroids would have been in his cells from his prior

---

[8] The transcript of the juvenile fitness hearing is part of the appellate record in *People v. Chamberlin*, F041358, of which this court has taken judicial notice at appellant's request.

[9] Under former Welfare and Institutions Code section 707, appellant was presumptively unfit for juvenile proceedings since he was charged with murder but could overcome the presumption based on the evaluation of five criteria: (A) the degree of criminal sophistication exhibited by the minor; (B) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (C) the minor's previous delinquency history; (D) the success of previous attempts by the juvenile court to rehabilitate the minor; and (E) the circumstances and gravity of the offenses alleged to have been committed." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 671, 685-686.)

use and modified his metabolism. Dr. Bronner's opinion was based on his experience with people who took cortical steroids, and he believed the same process applied when someone took anabolic steroids, but he had not conducted research on the question. He believed appellant's behavior was not premeditated or voluntary. Appellant could have made plans and decisions while emotional and in a psychotic state, but those decisions were based on his feelings and not voluntary, thoughtful, or rational judgments.

### *The court's ruling*

The court found appellant was unfit for juvenile proceedings, and there was evidence of advanced planning and a sophisticated attempt to carry out the plan. When appellant left his friend's house, he arranged the pillows under the blanket to make it look like he was still sleeping on the couch, showing "the thought was in his mind at some point to do something which he knew was unacceptable because he wanted to conceal his absence." The court cited the note appellant left at his own house, asking his mother to call him when she went to bed. The court could not discount that his note could have been part of appellant's process of learning when she was going to bed, and it may have been in his mind to commit the crime "before that note was written and before he left home." The court also cited appellant's conduct in taking off his sandals before he walked into his own house, his selection of a weapon, how he made the 911 call, and that he told his false story to officers at least twice before he finally admitted what he did.

As for his potential rehabilitation, the court noted appellant was 15 years old and could receive up to 10 years of treatment if he was in the juvenile system. The court acknowledged the reports about appellant's intelligence and success in school, but found appellant also had the sophistication to start planning five months in advance to take steroids to advance his goal of making the football team, and he engaged in illegal and criminal conduct to achieve that goal.

> "It strikes the Court that the element of intelligence and sophistication beyond a 15-year age also is an indication that, to the degree he were

wanting to, he would have, perhaps, the ability or the desire to work with the system in order to achieve a long-range goal, and that is to be released.

"And so there, the evidence of his intelligence and sophistication and his maturity beyond his years actually is an indication to the Court that the objects of rehabilitation might simply be jogged or taken advantage of. *And so I have no confidence that even over a lengthy period of time that he would not be in the position to try to simply do what the system required without really affecting what is going on beneath the surface*." (Italics added.)

As to the gravity of the offense, the court cited the planning and calculation to kill his mother at close range. It rejected appellant's alleged steroid use as a mitigating factor.

"In fact, to be frank with you, I am not greatly impressed with the testimony the Court heard with regard to the issue of steroids. [¶] First of all, there is, as I understand the facts before me, no evidence of current steroids in the system. I heard the doctor's discussion of the presence or continuing presence of the steroids in other tissues; but, frankly, his basis for so stating, it seemed to me, to be extremely limited. Not only his lack of direct connection with it, but, it seems to me, the speculative nature of reaching that conclusion on what sounded to me like an extrapolation from cortical steroids to anabolic steroids without scientific evidence to show it no evidence to show that, in fact, there was any evidence of anything in the system that would show that any of these chemicals continued to be there on any basis, that they were being broken down, no by-products. There was no such evidence, and I don't even know if those things exist. [¶] But the use of the steroids, to whatever it may have contributed here, it seems to me, does not change the fundamental nature of the act."

### Trial, verdict, and sentence

In June 2001, Judge Kelly presided over appellant's jury trial on the murder charge. During the pretrial motions, defense counsel moved to exclude certain photographs taken at the crime scene and during the autopsy. The court partially granted the motion but admitted the majority of the photographs.

The defense theory at trial was that appellant committed a "rage killing" that was not premeditated, and he was guilty of the lesser included offense of second degree murder. As noted in the factual statement in Part I., above, there was some trial evidence

18.

that referred to appellant's steroid use, and the parties stipulated there was no evidence of steroids in appellant's blood and urine tests. In contrast to the fitness hearing, however, there was no expert testimony at trial about the possible impact of his steroid use on the homicide.[10]

On June 28, 2002, the jury found appellant guilty of first degree premeditated murder and found the personal use enhancement true.

On August 19, 2002, the court sentenced appellant to 25 years to life plus one year for the personal use enhancement.

**Affirmance on appeal**

In *People v. Chamberlin* (Nov. 26, 2003, F041358) [nonpub. opn.] [2003 Cal.App.Unpub. LEXIS 11167], appellant raised a single issue on appeal: that the trial court committed prejudicial error when it admitted certain crime scene and autopsy photographs. This court affirmed the judgment and held that while the photographs were graphic and unpleasant, they were relevant and not unduly prejudicial because they portrayed appellant's violent conduct when he stabbed his mother. (Slip Opinion at pp. 8-10.) The California Supreme Court denied appellant's petition for review. (See ACCMS entry on 2/10/2004)

## PART III

## CDCR'S ABILITY TO RECOMMEND RECALL UNDER SECTION 1170, SUBDIVISION (D)(1)

The instant appeal is the result of proceedings that began when CDCR recommended recall of appellant's indeterminate sentence and that he should be resentenced pursuant to the statutory authority set forth in section 1170, subdivision (d)(1).

---

[10] As we will explain in Parts IV., V., and VI., appellant's motion for recall and resentencing, and witnesses who testified in support of his motion, repeatedly cited the possible impact of his steroid use on his commission of the murder.

As we will discuss in detail below, subdivision (d)(1) authorizes the trial court to modify an inmate's sentence upon a recommendation from the Secretary of the CDCR (the Secretary) to "recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced…." Such a recommendation may be made when the inmate demonstrates "exceptional conduct" in prison, defined as "behavior while incarcerated [that] demonstrates sustained compliance with departmental regulations, rules, and requirements, as well as prolonged participation in rehabilitative programming." (Cal. Code Regs., tit. 15, § 3076.1, subds. (a)(1), (b)(1).) The recommendation may not be based on a referral from the inmate or other parties on his or her behalf. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 456 (*Dix*); Cal. Code Regs., tit. 15, § 3076.1, subd. (b)(3)(A).)

The Secretary's recommendation is not binding on the superior court, and the court has discretion to decide whether to recall the inmate's sentence and resentence him. (*People v. McCallum* (2020) 55 Cal.App.5th 202, 210–211 (*McCallum*).)

**CDCR's Recommendation**

On June 4, 2018, the Secretary sent a letter to the Superior Court of Kern County, recommending recall of appellant's indeterminate life term and that he should be resentenced, as authorized by section 1170, subdivision (d)(1). Appellant had served 17 years and was not yet eligible for parole.

The Secretary's letter stated appellant's sentence deserved the court's attention for the following reasons.

> "A review of the Electronic Records Management System and Strategic Offender Management System indicates [appellant] was 15 years of age when he committed his offense and is now a 32 year old 1st term offender. With the exception of one serious rules violation report for possession of inmate-manufactured alcohol in 2005, he has been conducting himself in a positive program since his commitment date. He has earned a state certificate as a drug and alcohol counselor and has accumulated over 6,623 hours of work experience in the Prison Industries Authority Optical

20.

Laboratory. He also attends and facilitates classes relating to Alcohol Dependencies, Anger Management Alternatives to Violence, Youth Diversion Programs, and many others. He completed the Offender Mentor Certification Program General Education Diploma in 2005, has completed college courses and has participated in numerous self-help groups and vocational training programs. He is to be commended for taking full advantage of the opportunities provided to him in order to prepare himself for a successful transition back into society."[11]

### *The diagnostic study and evaluation report*

The Secretary's letter was accompanied by a detailed "Diagnostic Study and Evaluation Report" prepared by CDCR in support of the recommendation. The report listed appellant's achievements, programs, and education completed while in prison, and commendations for his work ethic and mentorship to other inmates, as summarized in CDCR's letter.

These details included appellant's completion of his high school diploma, earning multiple counseling certificates, passing the state examination for certification as a drug and alcohol counselor, obtaining an Associate of Arts college degree, and enrolling in a college degree program; certificates of achievement for courses in cognitive and behavior therapy, anger management, and multiple workshops; commendations from CDCR for engaging in self-help activities, including facilitating workshops for victims and offenders, young offender mentoring, addictive prevention and relapse behavior; and certificates of completion in programs and workshops for anger management and domestic violence.

---

[11] At the evidentiary hearing that was held in this case, Sheila Marquez, a CDCR correctional counselor, testified about how appellant's sentence was recommended for recall. The warden at Valley State Prison, where appellant was housed, asked Ms. Marquez and four other counselors "if we could think of anybody worthy of a possible review for recall of commitment … and we were supposed to maybe come up with ten names." Ms. Marquez testified everyone selected appellant because of his work in a youth offender program, his mentorship in drug and alcohol training, and self-help groups that he worked with. Appellant did not know about the warden's inquiry and did not try to influence the counselors to name him.

The report also contained a brief summary of the crime and stated that the investigation into the murder revealed appellant had taken steroids for approximately three months, but analysis of his urine sample was negative for steroids.

The report stated appellant had "never required mental health services" in prison, he had never committed a serious rules violation, and his classification score indicated he was a very low security risk. Appellant was supported by relatives and friends, and his certification as a drug and alcohol counselor increased his prospects for employment.

## PART IV

## APPELLANT'S MOTION FOR RECALL AND RESENTENCING

On October 26, 2018, appellant filed a motion in the Superior Court of Kern County and requested the court follow the Secretary's recommendation and recall his sentence of 26 years to life under subdivision (d)(1) of section 1170. Appellant argued the superior court should resentence him and order his "immediate release with 10 years of supervised felony probation" since he had already served 17 years in custody.

Appellant argued the Secretary's recommendation for recall and resentencing was "highly rare," and it was initiated by CDCR based on appellant's "extraordinary transformation in prison and his likelihood of successful transition back into society." Appellant had "a demonstrated, sustained, and overwhelming record of rehabilitation" that satisfied the statutory criteria for recall and resentencing, and he had " 'changed as a person and would be a positive asset to the community' if released."

Appellant argued he should be immediately released on probation because he had "a comprehensive and secure reentry plan in place," family members were going to support him, and he would agree to any type of transitional program ordered by the court. He had become a certified addiction treatment counselor, his counseling experience in prison would allow him to apply for entry level positions, and he had already received a job offer.

22.

Appellant's motion also addressed the circumstances of the murder, and asserted that at the time of the crime, he had been involved in three months of "heavy steroid use" that helped him join the football team and "overwhelmed his emotions and judgment." Appellant's motion conceded that laboratory tests showed there were no steroids in his system at the time of the murder. However, appellant cited Dr. Bronner's testimony "during a September 18, 2001 hearing," that appellant's "three months of heavy steroid use preceding his mother's murder overwhelmed his emotions and judgment. Though crime lab tests show no steroids in [appellant's] blood stream at the time of the murder, Dr. Bronner testified that steroids would have attached to his tissue and affected his behavior. [Appellant] began taking steroids in April and continued through the first week of June 2001, when he stopped about 10 days before the murder."

Appellant accepted "full responsibility for his crime without excusing his behavior to drug use or any other external forces/explanations," but also argued his steroid use "contributed to damaging his young mind's ability to reason and think and ultimately control his emotions."[12]

Appellant acknowledged that members of his mother's family would likely testify against his release, but asserted that other family members would testify that if his mother could see his "transformation into a bright, empathetic, and productive young adult with deep remorse and regret, that like most loving parents, she would forgive him and advocate for his immediate release. His release would appropriately honor the life, memory, and legacy of [his] mother."

---

[12] In making these arguments about his steroid use, appellant's motion failed to clarify that Dr. Bronner only testified at the juvenile fitness hearing, the court rejected his testimony about steroids, appellant was found not fit for juvenile proceedings, was tried as an adult, and the defense did not introduce any expert testimony at his jury trial about his steroid use. Appellant's motion also failed to acknowledge that in his pretrial statements to the detectives, he said he had stopped using steroids about one month before the murder, contradicting his later statements to Dr. Bronner about his usage.

### *Dr. Musacco's report*

Appellant's motion was supported by a psychological evaluation conducted at the request of his attorney by Dr. Michael Musacco, during two examinations in December 2018 and January 2019.

Dr. Musacco found it was "significant" that appellant had used two 6-week cycles of anabolic steroids prior to the murder and had been off the substances for about 10 days before the crime. Appellant was "uncertain if his use of these drugs contributed to his behavior, but he recalled that he experienced some feelings of depression during the time he was using [the drugs]."[13] Appellant said he used steroids because of his vanity, to be a successful athlete, and be popular with his peers.

In response to Dr. Musacco's questions, appellant gave the following account about his mother and the murder:

> "[Appellant] told me that his mother was always a good provider and he had good relationships with his extended family (grandparents on both sides). He experienced some emotional difficulties because he wanted to have a relationship with his father and he recalled experiencing emotional pain growing up because his father was not alive. Nevertheless, he knew that his mother loved him and he loved his family in return.[14]

> "I asked [appellant] to describe the events leading to his offense. He told me that his mother had always provided him with money, clothing, and all of the material possessions that he wanted. Although his family was not wealthy, he always had the latest clothes, shoes, and he fit in with other children that came from wealthy families. He was overly concerned with being popular and he believed his mother's financial support was necessary for him to fit in with the popular crowd at his school. He told me that he was way too concerned with what other people thought about him and noted that his mother 'spoiled' him, and was 'very generous.'

---

[13] Dr. Musacco accepted the accuracy of appellant's statements about his steroid use without noting his contradictory pretrial statements to the detectives, that he stopped using steroid pills three months before the murder and injected a small amount a few months before the murder.

[14] Appellant was seven years old when his father died of a drug overdose.

24.

"In line with these thoughts, [appellant] believed that his mother would purchase him a car when he turned 16. However, one to two weeks prior to the offense, his mother told him that she was $40,000 … in debt. She had poor spending habits and she told him that their lifestyle would have to change. He realized that he was not going to get a car on his 16th birthday, and he would no longer have the financial support to project the image that he wanted to project to his peers. At the same time, his sister (who had moved out one year earlier) was having relationship difficulties, and his mother told him that she would be moving back to the house. [Appellant] told me that the house had become very peaceful and quiet without his sister, and all of this data was greatly upsetting to him."

Appellant said as a result of these changes, "he began thinking that his life would be better if he didn't live with his mom."

Appellant said that the day before the murder, his mother refused his request for an allowance. He spent the rest of the day with his friend. That night, he thought about "how his life would be better if his mom was killed. He noted that people would feel sorry for him and they would give him all of the material possessions he was used to. [Appellant] told me that he is deeply shameful of these thoughts and feelings, but these thoughts and feelings led up to his offense. He left Matt's house late and night and walked to his house with a plan to kill his mother. He believed that he would be able to kill her, return to Matt's home and no one would know he was the perpetrator. He told me that he loved his mother and he was not angry with her and did not hate her. He indicated that he was not generally an impulsive person, but he felt like he was 'on autopilot,' he was so focused on getting a car that he didn't consider the consequences of his behaviors."

Appellant said he decided to stab his mother while he was walking home, and knew his behavior was wrong. He went into his house and took a knife from the kitchen.

"[Appellant] didn't recall engaging in the behavior, but he took off his shirt because he knew that he did not want bloodstains on it. He walked into the hallway and turned on the air conditioning unit to cover any noise that he might be making. He walked into his mother's bedroom and stood next to the bed. He recalled that he had the knife poised and in his head, he said to

25.

himself 'I can't do this.' According to him, 'At that moment my hand goes down and I stabbed her in the chest.' He told me that his mother woke up and said 'please stop.' From this moment on, he only has flashbulb type memories of his behaviors. He knew that he stabbed his mother many times. He told me that he panicked and did not think about what was happening. He recalled that she stood up and had a phone in her hand. He knocked the phone out of her hand and the next memory that he has is of his mother saying 'Parker' (at this point [appellant] was tearful). [Appellant] told me that he could only recall stabbing her on one occasion, and he remembered standing in the bathroom looking at himself in the mirror. According to him, 'It was like I woke up.' "

Appellant realized he cut his hand. He went back into his mother's bedroom and saw how bad it was. He felt "empty" but did not feel "remorse, shame, or fear." He started to walk back to Matt's house and realized his story would not work because of his knife wound. He decided to go back to his house, call 911, and report he found an intruder in the house. Appellant believed he was in shock when he called 911 and talked to the police.

Dr. Musacco asked appellant why his mother's family believed he was a psychopath. Appellant said his family tried to make sense of his behavior based on his conduct before he killed his mother. Appellant said about a year before the murder, he stole over $1,000 from his mother's bank account using her credit card personal identification number. She found out and grounded him for half of his sophomore year. Around the same time, he drove his mother's car around without permission about six times. His mother also knew he tried marijuana, chewed tobacco, and he was drinking and getting drunk, even though "he had projected an image of being a good kid who wouldn't engage in those behaviors."

Dr. Musacco gave his opinion that appellant did not have psychopathy and was not at risk for reoffending if released.

"I note that [appellant] does not exhibit signs or symptoms of a traditional mental illness. He did not describe or present with symptoms of depression, psychosis, or anxiety. This is not surprising insofar as [appellant] has not complained of any of these symptoms.

26.

"I also note that I did not see evidence that [appellant] possesses psychopathy.  I note that [appellant] has been incarcerated for the entirety of his adulthood.  He has been observed continuously over the course of the last 17 years, and his behaviors have been monitored and recorded by virtue of the fact that he is a CDCR inmate living in a well supervised community.  With one exception (Rules Violation Report for possession of pruno) there is no documentation describing psychopathic behaviors in the custodial setting.  Psychopathy as a construct is not a condition which can be perfectly concealed for 17 years.  In addition, a person cannot be properly identified as a psychopath based on two or three discreet behaviors, no matter how heinous those behaviors are.  The seriousness of [appellant's] offense (killing his mother) cannot be overstated or easily explained.  By all accounts, his mother was a good person and a good mother, but his behaviors cannot be attributed to a mental illness, including psychopathy.

"I was asked to assess whether or not [appellant] possessed psychopathy, and whether I believed he posed a risk of harm to others in the community.  [Appellant] obtained a low score on the PCLR, and he does not meet the criteria to be labeled as a psychopath.  Furthermore, he does not meet the criteria for diagnosis such as antisocial personality disorder.  [Appellant's] behavior is beyond reprehensible, yet there is no further evidence to indicate that he possesses a mental disorder or risk of harm to others."[15]

### *Supporting exhibits*

Appellant's motion was supported by CDCR's diagnostic study that had been filed with the Secretary's recommendation to recall his sentence.  He also submitted supporting letters from coordinators of the programs that he completed in prison, stating he was a positive role model to his peers, a mentor in the substance abuse treatment program, he was open and honest, he had expressed regret for his crime, completed an internship in a clinical recovery program, had excellent grades and completed coursework

---

[15] As we will discuss in Part V., *post*, a licensed family/marriage and trauma counselor, who had worked at CDCR to prepare sentencing and treatment evaluations, testified at the evidentiary hearing on appellant's motion for recall.  In her opinion, Dr. Musacco's opinion was based on incomplete information because appellant had never received a full psychological evaluation or individual counseling after he committed the murder, and she criticized Dr. Musacco for using a single test to conclude appellant did not suffer from psychopathy.

in CDCR's education classes; received commendations as a role model and for his exceptional work in several positions in prison industry employment; and received praise for starting a self-help program and acting as a facilitator between victims and offenders.

There were supportive letters from correctional officers and prison counselors praising his positive conduct and attitude, never observing any negative conduct, he was a role model for his peers, he created and coordinated several self-help workshop programs for inmates, and he developed a comprehensive and realistic reentry plan.

**The district attorney opposition**

On December 4, 2018, the Kern County District Attorney's Office filed opposition to appellant's motion to recall his sentence and be released on probation. The district attorney disagreed that appellant's postconviction conduct was the critical factor to decide the motion, and argued section 1170, subdivision (d)(1) permits but does not mandate the superior court to consider postconviction factors in deciding whether to grant the motion.

In support of the opposition, the district attorney filed crime scene photographs of the victim, and several letters submitted by the victim's family and friends at the original sentencing hearing in 2002, that warned of his manipulative behavior, urged the court to impose the most serious sentence, warned that a future parole board would not understand his ability to be a characteristic and motivated manipulator and expressed hope that he would never be released on parole.

**Appellant's reply**

On January 31, 2019, appellant filed a reply to the opposition, and complained that the prosecution improperly focused on the facts of his crime, and the motion for recall should be granted based on his postconviction efforts to rehabilitate himself in prison and the low risk he posed if released.

Appellant discounted the prosecution's claim that his performance in prison was a "'façade,'" and argued CDCR's staff was "well equipped to identify and handle the most sophisticated criminal minds" and determined he should be resentenced.

Appellant submitted additional letters from people who worked with him in prison, who praised his exemplary work and urged his immediate release.[16]

**The district attorney's response**

On February 4, 2019, the district attorney filed a response to the reply, and noted the letters filed in support of appellant's reply were from "convicted criminals, professional rehabilitators, and pro-criminal activists," and not from anyone personally affected by appellant's "brutal murder of his own mother as she lay in her bed."

The district attorney submitted several letters from the victim's family and friends, written in anticipation of the court's upcoming hearing on appellant's motion for recall of his sentence. Appellant's sister wrote that she was terrified of him, she would be afraid if he was released, and he acted like a model prisoner as part of his agenda to get released early. The father of appellant's sister claimed appellant was psychotic, and he and his

---

[16] While this case was pending on appeal, appellant filed two separate requests for this court to take judicial notice of certain educational achievements and certificates that were not before the superior court, pursuant to Evidence Code section 452, subdivision (h) and Rule 8.252 of the California Rules of Court: the "Degree Audit Reporting System (DARS) Report from Ohio University" that showed appellant was "just two credits shy of obtaining his Bachelor of Specialized Studies Degree … while maintaining a 3.870 grade point average"; and the "California Substance Use Disorder Certified Counselor ('SUDCC') Certificate earned by [appellant], issued by the California Association of DUI Treatment Programs ('CADTP'), effective September 13, 2019 through September 13, 2021," that required "315 hours of formal Substance Use Disorder ('SUD') education and 2,080 hours of SUD-related work experience."

We decline to take judicial notice of documents and information that were not before the superior court (Evid. Code, § 459), but note that the court acknowledged appellant's extensive record of academic and educational achievements when it addressed his motion for recall and resentencing.

daughter were both afraid that he was going to be released because he could "snap" again.

Ms. Knapp's father wrote that appellant committed a premeditated and vicious murder, but he never performed any acts of contrition toward any of the victim's family or friends, and he should serve his term and then be evaluated for parole.

Ms. Knapp's sister wrote that appellant may be a model prisoner but questioned his motives and would never trust him because he was "a charming and convincing liar" and he should not be released. If he was released, she asked the court to issue a stay-away order to protect the victim's daughter and other family members.

## PART V

## THE EVIDENTIARY HEARING

On February 6, 11, and 13, 2019, Judge Bush conducted an evidentiary hearing on appellant's motion for recall and resentencing. Appellant had the burden and began the presentation of evidence.

## APPELLANT'S EVIDENCE

### Dr. Musacco

Dr. Musacco, who prepared the psychological report submitted in support of appellant's motion, testified that he interviewed appellant for four or five hours to conduct the evaluation. One of the key issues was whether appellant possessed psychopathy, which is a "set of personality traits that is defined by a person who is callous, who will abuse others. They will be looking out for number one without any regard for the impact that their behavior may have over other folks." A psychopath has a "very superficial and glib way of looking at the world and relating to people. They can be smooth in terms of their interactions and their ability to read and manipulate people. So partially it's this affective or interpersonal mask that they put on … being charming and then using that charm to get over on other people to hurt people, to steal from people, that would be the general makeup of a psychopath." Psychopathy was also a life-long

30.

pattern of behavior that would continue even after a person was incarcerated. Sociopathy is synonymous with antisocial personality disorder, and generally a milder form of psychopathy.

Dr. Musacco evaluated appellant for elements of psychopathic characteristics using the Hare psychopathy checklist, which is a structured interview that required a thorough review of appellant's prison records to ensure his responses were accurate and he was not just "turning on the charm" for the few hours of the interview.

Dr. Musacco concluded that appellant "definitely" did not have antisocial personality disorder or psychopathy. The antisocial personality disorder requires evidence of antisocial behaviors occurring after the age of 18 years. Since appellant was incarcerated when he was 15 years old, there was no evidence of antisocial behaviors from the moment of his offense. Prior to his imprisonment, "there were several behaviors that would maybe alert me for the possibility of an antisocial personality disorder. So that's a slam dunk. There is no personality disorder here."

Dr. Musacco testified prison officials regularly see inmates who display psychopathic behavior, and appellant could not fool professional correctional officers and counselors for 17 years. Appellant had been in the "fish bowl" of the prison system and participated in self-help counseling, and there was no record that he ever received mental health treatment or medication.

While appellant's crime was horrible, Dr. Musacco did not see "that psychopathy would account for his behavior, given the totality of his functioning," and he would have expected more behavioral evidence of psychopathy. Dr. Musacco believed appellant did not pose a substantial risk to the community, and he did not have a mental disorder that would pose a current risk of danger if released.

Dr. Musacco was asked why a child would stab his mother 35 times. He acknowledged appellant murdered his mother in a manner that was "well in excess of what would be necessary to kill a human being." The "first stab" was the "more

31.

conscious" act and then his conduct became "overkill." Based on appellant's account of the murder, Dr. Musacco believed appellant's "stress hormones" increased his aggression after the initial stab and pushed him "over the top," and caused him to only remember the initial stab.

On cross-examination, Dr. Musacco conceded appellant's behavior during the crime was "pretty inexplicable" and "pretty horrifying," and he could not understand why appellant committed the murder.

> "So looking at that behavior, just by itself, I couldn't rule out psychopathy. In fact, that might be a very good hypothesis to start off with. Looking at the whole picture of behaviors, I was able to rule out the psychopathy."

Dr. Musacco acknowledged that the lack of a psychopathy diagnosis did not mean the person would not be at risk to reoffend, and that most people who commit murder might not necessarily meet the criteria for psychopathy. However, appellant had spent 17 years in a setting that could promote violence and had not engaged in such behavior, that could mean his crime was an aberration rather than a pattern of behavior.

**Appellant's hearing testimony**

Appellant did not take the stand at his criminal trial but testified at the evidentiary hearing to recall his sentence. He was 33 years old and had been in prison for 17 years.

Appellant's attorney asked what caused or motivated him to kill his mother. Appellant replied it was "complicated," but testified that at that time, he believed that his life would be better if his mother was dead, and her death would alleviate problems and pressures he felt that summer.

Appellant testified that when he was a teenager, he believed that he was not loved or valued within his family and he had to earn that love, and his sense of self was based on the validation of other people and not attached to anything authentic. He felt this way because his father died of a heroin overdose when he was seven years old. Appellant

32.

thought his father chose drugs over him and felt his father's overdose death was his ultimate rejection of him.

Appellant testified he used anabolic steroids for an 18-week period before the murder. He took steroids through both pills and injections and was on six-week cycles of being on and off the drugs. He believed his steroid use resulted in impulsive decisions that he did not understand at that time, like quitting baseball in the spring and dropping a summer school class even though he got a top grade. He also experienced depression when he was taking steroids.

Appellant testified in June 2001, his mother told him she was significantly in debt and their lifestyle had to change. "Not that we would be destitute or homeless, but that all of the things like the material things, new clothes, having money that I was accustomed to receiving, that she had always indulged because she was so generous, that I was not going to get those things anymore." Appellant expected that she was going to buy a car for him when he turned 16 years old, but his mother said she was not going to be able to do that.

Appellant testified that when he committed the murder in July 2001, it had been about one month since he finished taking a steroid cycle.[17] He did not feel any depressive symptoms on the day of the murder.

On the morning of the murder, appellant asked his mother for an allowance of $60 she had previously promised to him. She declined to give it to him. However, she did not tell him that he would be unable to pay the expenses for football or other things. His mother's conversation with him "triggered this idea in my head that all of these expectations and … plans that I had for … my junior year in high school, were falling apart."

---

[17] As we will explain in the analysis below, appellant's hearing testimony about his steroid use was inconsistent with his prior statements to various parties, and his blood and urine tests taken shortly after the murder.

Appellant spent the day with his friend Matt, and they talked about what they were going to do in their upcoming year in high school. Matt asked whether he would be able to do certain things because of his mother's financial issues. [18] Appellant said yes, but "it really gave me pause." Appellant felt that he was under pressure and "against a wall" because he would not "be able to continue to meet the expectation of the people around me" and receive the "validation that I need," and "I panicked."

Appellant stayed at his friend's house that night. Around 10:00 p.m. or 10:30 p.m., Matt was asleep, and appellant started to realize that "if I kill my mom, this will solve my problems. That my family will feel sorry for me. That there won't be so much pressure. That my family will give me the things that I thought I was not ever going to receive anymore." He thought people would feel sorry for him because his mother was dead and buy him a car. He panicked and "made this terrible, terrible, impulsive decision. And once I had made the decision, it was like I was on autopilot. I had no consideration for my mom" or how it would impact his family or himself. "I just acted."

On cross-examination, however, appellant admitted he formed a plan in his head about how to murder his mother. "Once I had made the decision to do this … I definitely" made a plan to make it look like he was still at Matt's house. He came up with a story about how an intruder attacked his mother at her house. His plan was to leave Matt's house at night, and he staged the scene with pillows, so it looked like he was still sleeping there. As he walked to his house, "I was thinking that I'm going to get a car when I'm 16 … almost the whole time that's what I'm thinking."

---

[18] As set forth in Part I., *ante*, Matt testified at appellant's jury trial that appellant was never critical of, nor expressed animosity toward, his mother. Matt further testified that on the night before the murder, appellant was in a normal, happy mood, he was not down or depressed, and he did not talk about his mother, having to do housework, or complain about anything.

When he was arrested and questioned at the police station, he thought he deserved to die because of what he did. Appellant testified he felt "tremendous remorse" and knew "how much my mom suffered that night," and he took her life "in the most brutal, calloused way possible." Appellant said he betrayed his family in the worst way possible and caused "tremendous suffering" to everyone who knew his mother and himself.

Appellant testified everything had changed in his life since he had been in prison, and his identity was no longer "grounded in what people think or what people want from me. It is grounded in values like love and compassion and integrity and community." Appellant was remorseful and did not think he could ever sufficiently pay for what he did. His worse day in prison was "nothing" compared to the grief, sadness, and pain he experienced every day, "knowing that I am the one who murdered my mom … caused the suffering that I did."[19] He turned his life around in prison because he realized his life could count, he wanted to develop and grow, and help others do the same, and not because he expected an early release.

Appellant felt accountable for what he did, and his prison sentence was justified because what he did "was worse than awful." He did not request or encourage anyone to seek recall of his sentence, and he did not know about it until his name was submitted to CDCR. His grandmother had offered a room for him to live in, and he had two employment offers from restorative justice organizations.

Appellant testified that after he was imprisoned, he exchanged letters with his sister, but those contacts did not continue. No one from his mother's family visited him in prison, and he knew he devastated their lives and did not resent them. He had never contacted any members of his mother's family because CDCR "emphatically" advises prisoners not to contact crime victims.

---

[19] Appellant testified that in 2005, an inmate stabbed him in the stomach while he was in the prison yard, and other inmates jumped him and stabbed his leg.

Appellant was sensitive to the pain of family members who did not want him to be released from prison, and that he was forcing them to cope with his possible release. But considering all the perspectives, "the balance of those decisions is that I would like to be released."

Appellant felt that "any type of material freedom" he would experience would be an act of "mercy and grace." He did not feel entitled but wanted to be released from prison.

**Testimony about appellant's conduct in prison**

Appellant called several witnesses who testified about his conduct and participation in numerous programs and jobs in prison: Sheila Marquez, a CDCR correctional counselor; Eric Roberts, the program director for the Offender Mentor Certification Program at Valley State Prison; Sonya Shah, who runs the Ahisma Collective restorative justice program; Richard Cruz, who had been appellant's prison cellmate and then became a program manager with the Ahisma Collective; Howard Lazar, who also led several prison workshops; Dr. David Paul, a physician and psychologist who taught a cognitive behavior program for inmates called Freedom to Choose; Karen Peterson, a psychologist who moderated workshops for Freedom to Choose; and Camille Pinto, an office technician who worked in the mental health department's crisis team at Valley State Prison.

These witnesses testified appellant was a model prisoner and mentor to other inmates; he was trustworthy, compassionate, helpful, dedicated, and kind; and he was not manipulative. They also testified appellant had taken responsibility for his actions and acknowledged the harm he had caused, and he would not be a threat to society if he was released from prison. Appellant had become a certified alcohol and drug treatment counselor and had been offered employment by two organizations upon his release.

Mr. Roberts testified appellant had shared details about his "commitment crime," and it was difficult to hear but seemed to be "very authentic …. Talked a lot about his

remorse, how he had processed over the years the crime that he committed and how he was living with it and trying to demonstrate … that he was a worthy human being, and … very deeply regretted what happened." Appellant took "full accountability for what he did, didn't blame anybody." Appellant did not break down and cry when he talked about the details, but Mr. Roberts believed he was in a lot of pain.

Ms. Shah testified the survivors of appellant's mother had not reached out to appellant through her restorative justice program, and she was not sure if they had become involved with any such program.

Dr. Paul testified he reviewed prior reports where appellant talked about his steroid use at the time of the murder. Based on appellant's prior statements, Dr. Paul testified it was impossible to say whether the steroids had any causative effect, but he was taking amounts that would have resulted in a high level of testosterone in his system that could have profoundly affected his mood and behavior. Dr. Paul conceded that appellant's drug test on the night of the murder showed there was "no abuse" of the drug, and appellant said he had stopped using steroids before the murder.

Both Dr. Paul and Dr. Peterson testified the brain of a 15-year-old person is physiologically different from that of a 33-year-old adult, and it was scientifically recognized that a person's brain will evolve and mature over time.

Dr. Peterson acknowledged she wrote a letter to Governor Brown in 2018 to support commutation of appellant's sentence and said that he was the type of man that "would make any mother beam with pride." She acknowledged that phrase was "tricky" because of appellant's crime and admitted she had never seen the photographs of the victim's multiple stab wounds.

**Character witnesses**

Appellant also called witnesses who knew him prior to the murder and testified about his character and reputation. Denise Jones testified her daughter and appellant dated for several months before the murder, and said appellant was respectful and good

with parents, but he could also be arrogant and full of himself. Ms. Jones stayed in contact with appellant after he was sent to prison through letters and visits. She believed appellant was very caring and engaging, and not manipulative. Appellant had grown up and significantly changed in prison and had come to terms with what he did. She had no reservations or safety concerns about his early release. After appellant was convicted of murder, she wrote a letter to the trial judge and asked for leniency because he was just a child, and it was unfair he was tried as an adult.

Ms. Jones testified her daughter disapproved of her contacts with appellant. After the murder, appellant's high school classmates were angry about what he did, and they took it out on her daughter since she had been dating him.

Bethany Cornell was appellant's cousin on his father's side of the family, and they had grown up together. Ms. Cornell testified appellant was selfish and full of himself as a teenager, but his character had changed while he was in prison. Ms. Cornell wrote to appellant and occasionally visited him. She did not have any reservations if he was released, and the family of appellant's father was committed to help him reintegrate into society if he was released. Cornell testified the families of appellant's father and mother had split over how to approach appellant after he was convicted and sentenced to prison.

## THE DISTRICT ATTORNEY'S CASE

## The lead investigator

Detective Krueger, the lead investigator in the case, described the victim's bedroom as one of the two most violent murder scenes he had seen in his career. There was blood over the bed, the sheets, the ceiling, and the wall. The knife was covered with blood. The victim's body was lying naked on the floor, and she had stab wounds and cuts all over her body, particularly around her head and face. There was a large wound in her lower abdomen, and her intestines were hanging out.

Detective Krueger testified that shortly after the police arrived, they placed appellant in the backseat of a patrol car in front of his house. Appellant had a deep cut on

38.

the palm of his right hand. He was very agitated, fidgety, and licking his lips. Krueger decided to conduct a cursory evaluation for drugs based on his very agitated demeanor.[20]

Detective Krueger testified about the interviews with appellant that occurred at the hospital and the police station, and how appellant consistently repeated his story about having a bad feeling, walking home, and confronting an unknown man who was stabbing his mother. Krueger particularly remembered that appellant gave an extremely detailed and specific description of the suspect, including his height, clothing, and that he "ran funny." Appellant was calm and not emotional when he made this statement.

During the interview at the police station, the detectives asked appellant to "rehash" his story about what happened. Appellant repeated his earlier story. They confronted appellant with inconsistencies in his story and asked if he killed his mother. Within three to five minutes of being asked, appellant confessed that he killed his mother. Appellant said his plan was to go back to Matt's house and claim he cut his hand at his friend's home. Appellant said he started to walk back to his friend's house but turned around and went to his own home and called 911 from there.

**Ms. Schumacher**

Joan Knowlden Schumacher, a licensed marriage/family therapist and trauma specialist, had previous experience working for a private contractor for CDCR to prepare evaluations and recommendations for sentencing and treatment. She had never interviewed or evaluated appellant and had not reviewed his CDCR records or evaluations.

Ms. Schumacher testified that she treated eight people who had been impacted by appellant's murder of his mother. This group included appellant's sister and the victim's

---

**20** Detective Krueger was asked if appellant's blood was collected after the murder. Krueger did not believe it was. As set forth in the factual statement in Part I., *ante*, however, the parties stipulated at appellant's trial that both blood and urine samples were collected, and he tested negative for alcohol, drugs, and steroids.

39.

friends. Ms. Schumacher had 160 contacts with these people during the 17 years that appellant had been in prison, and they had waived any privileges so she could testify about their sentiments.

Ms. Schumacher testified a number of these people feared for their safety if appellant was released because "they didn't see the murder coming and they don't know if now that they are opposing his release, if they would be safe." They were also outraged that he would not complete his sentence since his mother was dead, and "why should he be let off early when the crime and the punishment has not changed." They were upset because appellant had never made any contact with them "through the grapevine or any other way" to apologize or make amends for what happened. Appellant's sister initially corresponded with him in prison, but appellant never apologized to her in his letters.

Ms. Schumacher disagreed with Dr. Musacco's opinions and conclusions about appellant because his psychological evaluation was incomplete. She explained Dr. Musacco used the Hare psychopathy checklist to evaluate appellant, but that was a "self-report" test. In order to determine whether someone was a psychopath or sociopath, she would have used other tests such as the Millon and Minnesota Multiphasic Inventory tests, that give a full realm of diagnoses and have "a faking good scale, a faking bad scale. So you can tell if you are turning the test a certain way. They also have reliability and validity and blind questions that you don't know are going to give information." However, the Hare checklist "just answers one question and it does it by a self-report rather than blind questions."

Based on her prior evaluation of other inmates, Ms. Schumacher disagreed with Dr. Musacco's opinion that an inmate "can't fake good for 17 years." She had seen inmates with narcissistic and sociopathic personalities "fake good" in prison during her 30 years of experience. "The smarter they are, the better they can do it." She believed appellant was a very smart individual with an "incredible ability to influence other

people[.]" She believed appellant was "getting very skilled in that ability" because he was only a few classes away from earning a psychology degree in prison, and "as a counselor, you need to be able to know how to manipulate people to get them to find a better way of truth."

Ms. Schumacher testified that prior to this hearing, she did not think appellant would necessarily pose a physical risk to anyone if he were released. Her opinion changed after she watched appellant testify: "There's one thing that was very disturbing in his testimony. The only time he glanced at the left side of the court, which is where the family of the mother sits and friends, and that was only when his sister and the letters was mentioned. No other communication was directed that way." Ms. Schumacher testified the victim's family and friends had been waiting for appellant to contact them. Appellant's lack of eye contact signified that he was lying. She believed his risk to public safety could not be determined until he received a complete psychological evaluation. While she thought appellant's risk factors would be for manipulation of others, coercion, and scams rather than murder, she wanted appellant to complete a full battery of psychological tests, which he had never done.

Ms. Schumacher was surprised and concerned that appellant had never received individual counseling or tests that would better address his risk of reoffending, given his claims about the trauma resulting from his father's death and the nature of his crime. Based on her experience, the absence of counseling and treatment made the recommendation to release him "more confusing" because there had never been an "official diagnosis which would give somebody a direction to treat. He has not had trauma treatment. If his father's death was that much of an impact and he blamed his mother, then that all should be worked out before he's on the streets again."

Ms. Schumacher did not attempt to diagnose appellant since she had never evaluated him. However, the fact that he never received any treatment indicated he was at high risk for reoffending.

41.

## Ms. Knapp's father

Richard Moore, Ms. Knapp's father and appellant's grandfather, testified there were 1,800 people at his daughter's memorial service. One family from her school donated $10,000 to create a scholarship fund in her name.

Mr. Moore testified appellant and his mother were inseparable when he was very young. About a year before the murder, however, she told Mr. Moore that appellant systematically removed money from her bank account using her ATM card. When she realized what happened, she talked to appellant, but he lied about it. He finally admitted what he did, but his only concern was "who she was going to tell about it." Mr. Moore told his daughter to report the theft to the police and have appellant arrested, but she did not want to do that.

Mr. Moore explained that after the murder, he went to his daughter's house and waited for the media to leave, and then went inside and saw the blood all over her bedroom. He later learned the gruesome details about how appellant repeatedly stabbed and murdered her.

Mr. Moore was disturbed to learn that when appellant finally admitted to the police that he killed his mother, his first question to the officer was, " 'What's going to happen to me?' " Mr. Moore could not understand how someone could have murdered his mother and then asked that question.

Mr. Moore testified that some members of the family thought appellant's use of steroids were the problem. However, the police reported appellant's steroid use was not an issue. Prior to the trial, Ms. Knapp's family decided they were not going to support appellant in any way and tried to stay away from the media. The family felt relief when appellant was convicted and sentenced to life. They were very emotional now because they were against his release, and believed he needed to serve his full term.

Mr. Moore testified appellant had the capacity to be manipulative and noted his statement to the police after he confessed, asking what would happen to him. Mr. Moore

cited an incident that he knew about, when appellant was initially held in custody at juvenile hall and asked for a Bible, but only pretended to read it when people came into his room.

## Ms. Knapp's friends

Jennifer Kritsch was a teacher, she had been a good friend of Ms. Knapp, and she knew appellant very well. Appellant stood out as a superior student who was in the top one percent. Ms. Kritsch loved appellant and forgave him, but she felt he needed to pay the consequences because people were still really hurting, and "there needs to be time for that hurt. It's not going to go away, but I don't want anyone else to get hurt. And I just want to be sure that everything that they have said that he's done is true and accurate." She testified that all the complimentary things the previous witnesses said about appellant were true because that was exactly who he was.

Ms. Kritsch testified appellant had a lot of people stand up for him at this hearing, and "whether or not they believed that he manipulated them, they came forward and spoke highly of him, so, yes, I do believe he is still capable of manipulation," and he was skilled in it.

Debra Hankins had been Ms. Knapp's best friend since they were teenagers, and their sons were the same age. Ms. Hankins loved appellant. He was smart, popular and handsome, and a good student and athlete. Ms. Hankins testified the family was deeply in debt because appellant's father left them when he was a child. When appellant's father died, they received a life insurance settlement. Ms. Knapp used the money to pay the debts, buy a house and car, and she was very generous with appellant's allowance. However, she got into debt again shortly before the murder.

Ms. Hankins testified that a few weeks before the murder, Ms. Knapp said she had talked to appellant about their financial problems, and they had to change their lifestyle. She also told appellant that she could not buy him a car when he turned 16 years old.

43.

Appellant became very angry and embarrassed about it, and he was not happy with her. He wanted to appear to be wealthy.

Ms. Hankins was aware of appellant's activities while in prison and was not surprised by his success because he was always a "model" student. However, she believed he needed to serve his entire term because of how he premeditated the crime.

At the time of appellant's sentencing hearing in 2002, Ms. Hankins wrote a letter to the court expressing her view that appellant would " 'rise to the top in any setting,' " which is precisely what he went on to do, but "that's the part that concerns me the most …. [H]e is all of those things. And yet when something stood in his way of what he wanted, he committed that crime." She was worried about what would happen if appellant was released and confronted by something he did not like or did not meet his expectations.

Ms. Hankins also wrote to the sentencing court that she feared people might not see through his appearance and charm as time passed, and they would overlook the details of the crime he committed. She felt that was happening at this evidentiary hearing and was concerned that people who testified for appellant were not aware of the details of the murder. She did not want appellant to be miserable, but she did not understand how anyone could be certain he was not a danger to others.

### POSTHEARING ARGUMENTS

After both parties rested, the court asked for written arguments on the matter.

**Appellant's arguments**

In his posthearing briefs, appellant argued his continued incarceration did not serve the best interests of justice, it needlessly continued his detention in a dark and violent prison environment, and he should be immediately released on supervised probation. Appellant's immediate release would result in "finality and closure," and opposing family members "would be spared from potentially many future parole hearings.

44.

Appellant asserted he had taken advantage of every opportunity possible to learn from his experience, he had changed, and he would be a positive asset to the community if released. He was nothing like the teenager who committed the crime, and now understood the negative feelings he developed after his father's overdose death when he "never received counseling, treatment, or therapy for this childhood trauma."

Appellant's attorney argued the court should not "just look at the static factor of the crime alone, because that erroneously assumes that people don't change," but asserted that he "admitted almost immediately" that he killed his mother when asked directly by investigators.[21] Counsel also claimed the hearing evidence "strongly suggests that increased testosterone from prolonged steroid use negatively affected [his] judgment" at the time of the crime, but "as [Detective] Krueger testified, [appellant's] blood was not collected after the crime. Blood is the only way anyone could test for increased testosterone levels."[22] The nature of the multiple stab wounds indicated his release of "very strong negative emotion," it was not consistent with conscious, rational, or deliberate thinking, and once he began the assault, "his ability to stop, think, and conscientiously make choices was severely compromised."

---

[21] Appellant counsel's account of when and how he confessed is not accurate. As explained in Part I., *ante*, appellant gave a detailed account of the alleged intruder to the 911 dispatcher and the first officer who arrived at his house. A few hours later, the detectives talked to him at the hospital and asked what happened, and appellant gave the same detailed story. After that, the detectives conducted another interview and again asked appellant what happened, and appellant repeated his story. At that point, the detectives confronted him with inconsistencies in his story, and appellant stayed with his version for a few more moments. Finally, Detective Adair asked if he killed his mother, and appellant said yes.

[22] Detective Krueger testified at the hearing in this case that he did not believe appellant's blood was taken at the time of the crime in July 2001. As shown by the trial record, however, the parties stipulated at appellant's jury trial that blood and urine samples were taken from him shortly after the murder and were negative for drugs, alcohol, and steroids.

Appellant's counsel acknowledged that section 1170, subdivision (d)(1) contained permissive and not mandatory language to resentence him, but the court should not disregard his postconviction behavior since CDCR requested the court use its legal discretion to either release appellant immediately or ahead of his currently set parole date.

**The district attorney's brief**

The district attorney argued the only just result was to require appellant to serve out the rest of his sentence as originally imposed. Under section 1170, subdivision (d)(1), the court was not required to recall appellant's sentence, and it could consider the statutory list of postconviction factors only as part of the resentencing process, after it decided to recall.

The prosecutor asserted there was no credible argument against considering the nature of the crime to decide whether to recall. Appellant committed a premeditated and deliberate murder, "one of the most appalling crimes imaginable." There was extensive planning and premeditation, and his "unimaginable cruelty to his own mother speaks to the cruelty of which this outstanding child was capable."

The prosecutor further argued that appellant had not changed since the murder. He was a gifted and outstanding student when he committed the crime, and he had demonstrated these same qualities in prison and to the CDCR officials and others who testified on his behalf. "[H]ad [appellant] not committed this horrible crime, would a reasonable person say that he had changed? They would not. They would say that he is the same person, perhaps more mature and wiser. They would see his life on an unbroken course. It cannot be said, then, that this man has truly changed apart from his own words." Appellant's evidence about his mental state and pathology was far from uncontroverted because it was refuted by Ms. Schumacher's testimony and her explanation that Dr. Musacco's opinions were incomplete.

## THE COURT'S DENIAL OF THE MOTION TO RECALL

On March 13, 2019, the court denied appellant's motion to recall his sentence and made lengthy findings. The court reviewed CDCR's recommendation, all of the motions and supporting exhibits filed by the parties, and the testimony presented at the evidentiary hearing. The court acknowledged it was a very emotional time for everyone involved in the case.

> "… Most of you, I suspect, have known for many years that the day would come when [appellant] would be considered for release under some provision of the law. I also realize that day has come sooner than most of you would have expected. While I doubt you ever forgot what happened to [Ms. Knapp], I'm sure these last nine months since the filing of the petition has brought to the forefront many of the emotions that have been held at bay for many years."

The court was not sure "the English language is capable of adequately characterizing this murder .…" The court knew there were some people who felt a 15-year-old should have been processed in the juvenile system regardless of the crime, and others who wanted appellant to serve out the full sentence without any chance of early release.

> The court acknowledged the scope of its discretion to grant appellant's motion:

> "In this case, Penal Code Section 1170(d)(1) allows the Court, upon the recommendation of the secretary of CDCR, to recall and resentence the defendant if it is in the interest of justice. That language is permissive, not mandatory. The statute in part further allows the Court, *should it choose*, to consider post-conviction factors including the defendant's disciplinary record and record of rehabilitation while incarcerated and any evidence that reflects . . . that circumstances have changed since the defendant's original sentencing so that the defendant's continued incarceration is no longer in the interest of justice.

> "To simply state that the circumstances of the murder, in and of themselves, cause me to deny the petition is not in the spirit of the law, whether or not one agrees with the law, but it is equally outside the spirit of the law to ignore the facts of the murder and the defendant's character at the time of the murder and only consider his conduct since the murder.

47.

"There is, in fact, very little if any guidance in case law or the statutes for the Court and the attorneys to rely on for this code section. This is especially true for a murder case. I think the law requires a balancing act of all factors, including the facts of the murder and the defendant's conduct until today in deciding whether or not the defendant should be resentenced, and, if so, what that new sentence would look like.

"I do not make this decision lightly. Judges, including me, do not make decisions based on emotions or public opinion or feeling. We do not decide what we think the result should be and then work backwards to get there. We do not have the luxury of taking polls on what we should do, and in out branch of government we should not.

"We do not decide based on the number of letters that are written or the number of witnesses that testify, although, we do, of course, weigh the testimony of witnesses as best we can. I do not know if there is a right answer, and I put that in quotes in this case.

"Both sides presented strong, compelling facts and arguments to justify what they think the ruling should be. The facts of the murder are well known. [Appellant] has attempted to present significant evidence to show that he is rehabilitated. I do not believe it is necessary to repeat the evidence in this case, as it is fresh in my mind."

The court noted three people sent letters to the original sentencing hearing that predicted appellant would do anything in prison to convince a parole board of his rehabilitation and they feared a future board would feel compelled to release him. "I doubt these individuals wrote these comments with this particular hearing in mind, but if they knew him well, I believe they predicted the future." The court acknowledged appellant had "done well in prison" by staying out of trouble, getting degrees and certificates, and helping others.

The court denied the petition to recall and explained its reasons:

"As predicted, he has risen to the top, but when I weigh that against the facts of the murder and who the defendant was all those years ago, I cannot justify making a finding that resentencing is in the interest of justice. No one would have predicted what [appellant] would do to his mother that day, yet he did. Many people wrote letters to Judge Kelly expressing that the defendant's actions were out of character. They may have been, but he still committed the murder. When one considers what happened all those

48.

years ago, and the letters written by many who knew him well, some for him, some against, and compare that with what they say about him now, it is justified to believe in many ways that he has not changed."

The court once again recognized the scope of its discretion to rule on appellant's motion.

> "I recognize I can strike the weapon enhancement or reduce the conviction to second-degree murder. The evidence and overall circumstances do not justify that action and, in fact, would just be an easy way to justify a desired result. I also recognize that although [appellant] can be legally granted probation, even though he was convicted of first-degree murder, the evidence weighs against that outcome. Even considering his conduct in prison, as this is not a case where probation is justified, and is certainly not in the interest of justice to grant probation in this case."

The court concluded: "As I said before, there is no doubt in my mind that [appellant] will probably some day be released, but today is not that day."

On March 14, 2019, appellant filed a notice of appeal.

## DISCUSSION

Appellant argues the superior court abused its discretion when it denied his motion for recall and resentencing, it arbitrarily ignored the postconviction factors stated in section 1170, subdivision (d)(1) that supported his resentencing based on his exemplary conduct in prison, and there was substantial evidence to refute the court's finding that appellant had not changed since the murder.

### A. *Section 1170, Subdivision (d)(1)*

In general, a trial court loses jurisdiction to recall a defendant's sentence once execution of that sentence has commenced. (*Dix, supra,* 53 Cal.3d at p. 455; *People v. Karaman* (1992) 4 Cal.4th 335, 344.) Section 1170, subdivision (d)(1) is an exception to that rule. (*Dix, supra,* 53 Cal.3d at p. 455; *McCallum, supra,* 55 Cal.App.5th at p. 210.)[23] The subdivision states:

---

[23] "Section 1170(d) is the direct statutory descendant of a provision in the superseded *Indeterminate* Sentencing Law that had nothing to do with enforcing

49.

"When a defendant subject to this section or subdivision (b) of Section 1168 has been sentenced to be imprisoned in the state prison or a county jail pursuant to subdivision (h) and has been committed to the custody of the secretary or the county correctional administrator, the court *may*, within 120 days of the date of commitment on its own motion, *or at any time upon the recommendation of the secretary* or the Board of Parole Hearings in the case of state prison inmates, the county correctional administrator in the case of county jail inmates, or the district attorney of the county in which the defendant was sentenced, *recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence*. The court resentencing under this subdivision shall apply the sentencing rules of the Judicial Council so as to eliminate disparity of sentences and to promote uniformity of sentencing. The court resentencing under this paragraph may reduce a defendant's term of imprisonment and modify the judgment, including a judgment entered after a plea agreement, if it is in the interest of justice. *The court may consider postconviction factors, including, but not limited to, the inmate's disciplinary record and record of rehabilitation while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the inmate's risk for future violence, and evidence that reflects that circumstances have changed since the inmate's original sentencing so that the inmate's continued incarceration is no longer in the interest of justice*. Credit shall be given for time served." (§ 1170, subd. (d)(1), italics added; see also Cal. Code Regs., tit. 15, § 3076, subd. (a).)[24]

As italicized above, the instant case involves the provisions of subdivision (d)(1) where the Secretary recommended to the superior court that appellant's sentence should be recalled, and he should be resentenced.

---

comparative uniformity of sentences," contained in a parallel provision in section 1168, that provided for recall of sentences under certain circumstances. (*Dix, supra*, 53 Cal.3d at p. 457.) "Beginning in 1976, the recall provision of section 1168 was transferred in substance to new section 1170(d)" as part of the determinate sentencing act and has since been amended several times. (*Id*. at p. 458.)

[24] The version of section 1170, subdivision (d)(1), in effect at the time of the court's ruling in this case was identical to the current section, "except that it used the words 'he or she,' which were changed to 'they' effective August 6, 2020. [Citation.]" (*McCallum, supra*, 55 Cal.App.5th at p. 210, fn. 6.)

**B.** *Regulatory Provisions*

Title 15 of the California Code of Regulations identifies the circumstances where Secretary may recommend recall of an inmate's sentence and resentencing, as occurred in this case. (Cal. Code Regs., tit. 15, § 3076.1; *McCallum, supra*, 55 Cal.App.5th at p. 219, fn. 17.)

The Secretary may "recommend to a sentencing court that the sentence and commitment previously imposed on an inmate be recalled and the court resentence the inmate" under section 1170, subdivision (d)(1) "[w]hen an inmate demonstrates exceptional conduct," defined as "behavior while incarcerated [that] demonstrates sustained compliance with departmental regulations, rules, and requirements, as well as prolonged participation in rehabilitative programming." (Cal. Code Regs., tit. 15, § 3076.1, subds. (a)(1), (b)(1).)

CDCR's Classification Services Unit shall determine the inmate's initial eligibility for consideration. It shall review "all referrals received from a Warden, the Director of the Division of Adult Institutions, or the Secretary," but it "shall not accept referrals from inmates or other parties on behalf of inmates." (Cal. Code Regs., tit. 15, § 3076.1, subd. (b)(3)(A), (B); *Dix, supra*, 53 Cal.3d at p. 456.)

In determining the inmate's eligibility, the Classification Services Unit shall prepare a Cumulative Case Summary, which shall include information about the inmate's current commitment offense, brief description of the crime, and sentence, a summary of his or her prior record of juvenile petitions and adult convictions; any active holds or warrants, institutional behavior "including serious rules violation reports, drug test results, gang or disruptive group information, placement score, current housing assignment, a summary of work and educational assignments, and participation in rehabilitative programs and self-help activities," visitor history, and victim notification requirements. (Cal. Code Regs., tit. 15, § 3076, subd. (b)(3)(D).)

An inmate is not eligible if he or she has been sentenced to death or life without possibility of parole, required to register as a sex offender, not served either 10 continuous years or 50 percent of the current commitment, committed certain serious or violent rules violations, and are either scheduled for release or eligible for a parole hearing within 18 months.  (Cal. Code Regs., tit. 15, § 3076, subd. (c), § 3076.1, subd. (b)(2).)

If the inmate is found eligible, the Classification Services Unit shall prepare a cumulative case summary and refer the matter to the Secretary.  (Cal. Code Regs., tit. 15, § 3076.1, subd. (b)(3)(D).)  If the Secretary elects to recommend an inmate for recall and resentencing, a recommendation letter and the cumulative case summary shall be forwarded to the sentencing court and a copy provided to the inmate.  (*Id.*, subd. (e)(3).)  In addition, the Office of Victim and Survivor Rights and Services shall notify all victims registered with CDCR within a specific time period.  (Cal. Code Regs., tit. 15, § 3076.5, subd. (a).)

## C.  *The Superior Court's Discretion*

Upon receiving the Secretary's recommendation, the superior court has discretion whether to recall the defendant's sentence and resentence him as provided under section 1170, subdivision (d)(1).  The statutory language for the court to decide whether to act upon CDCR's recommendation to recall is permissive and not mandatory. (*McCallum, supra*, 55 Cal.App.5th at pp. 211, 214, 216–217.)  "In deciding whether to recall a sentence under section 1170, subdivision (d)(1), the trial court may exercise its authority 'for any reason rationally related to lawful sentencing.'  [Citation.]"  (*Id.* at p. 210.)

"The Secretary's request for recall and resentencing pursuant to section 1170, subdivision (d)(1) … provides no statutory entitlement to relief to the inmate even when the court credits the postconviction facts identified in the Secretary's recommendation materials.  [Citations.]  [T]he Secretary's recommendation letter is *but an invitation to the*

52.

*court to exercise its equitable jurisdiction.* [Citation.] It furnishes the court with the jurisdiction it would not otherwise possess to recall and resentence; it does not trigger a due process right to a hearing [citation], let alone any right to the recommended relief. [Citation.]" (*People v. Frazier* (2020) 55 Cal.App.5th 858, 866, italics added.)

In 2018, subdivision (d)(1) was amended to add language that expressly authorizes the court "in resentencing a defendant to consider 'postconviction factors, including, but not limited to, the inmate's disciplinary record and record of rehabilitation while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the inmate's risk for future violence, and evidence that reflects that circumstances have changed since the inmate's original sentencing so that the inmate's continued incarceration is no longer in the interest of justice.' " (*McCallum, supra,* 55 Cal.App.5th at p. 210; § 1170, subd. (d)(1); Stats.2018, ch. 36, § 17, eff. June 27, 2018 (A.B.1812).)

> "[W]e read the inclusion of postconviction factors in section 1170, subdivision (d)(1), as providing guidance for the trial court's resentencing decision, *not its initial decision whether to recall the sentence.* The postconviction factors were added in 2018 by Assembly Bill No. 1812 (2017–2018 Reg. Sess.), section 17. Notably, Assembly Bill No. 1812 placed the sentence containing the postconviction factors immediately following the second and third sentences of section 1170, subdivision (d)(1), both of which set limitations on the trial court's resentencing authority. We consider this structure of section 1170, subdivision (d)(1), in interpreting the purpose of inclusion of the postconviction factors. [Citations.] Further, the legislative history accompanying Assembly Bill No. 1812 describes the amendment of section 1170, subdivision (d)(1), as 'authoriz[ing] the courts to consider specific post-conviction factors when resentencing a defendant.' [Citation.]" (*McCallum,* at pp. 214–215, italics added.)

The Legislative amendments did not "alter the fact the trial court has discretion whether to recall and resentence the defendant." (*McCallum, supra*, 55 Cal.App.5th at p. 214.)

53.

Subdivision (d)(1) thus establishes a two-step process. First, the trial court decides whether to recall the sentence. If it does so, the second step is to conduct a resentencing hearing, when it may consider the postconviction factors enumerated in the statute. (§ 1170, subd. (d)(1); *Dix, supra*, 53 Cal.3d at p. 463; *McCallum, supra*, 55 Cal.App.5th at pp. 214–215.)

"We review the trial court's decision whether to recall a defendant's sentence [under subdivision (d)(1)] for an abuse of discretion. [Citations.] ' "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' [Citation.] The abuse of discretion standard "involves abundant deference" to the court's ruling.' [Citations.]" (*McCallum, supra*, 55 Cal.App.5th at p. 211; *People v. Frazier, supra*, 55 Cal.App.5th at pp. 863–864.)

**D.** *Analysis*

The court did not abuse its discretion when it denied appellant's motion for recall and resentencing. We first note the Secretary's recommendation for recall and resentencing was just that – a recommendation and not an order for the superior court to recall appellant's indeterminate sentence and resentence him to a shorter term or release him on probation prior to his eligibility for parole. Moreover, as appellant acknowledges, the court has discretion to grant the inmate's motion to recall and resentence him, and section 1170, subdivision (d)(1) describes the court's ability to address such a motion in permissive rather than mandatory language.

Nevertheless, appellant asserts that the court abused its discretion because it should have accorded greater value on the evidence he presented in support of his motion. Such an argument is based on the premise that the court abused its discretion by failing to accept appellant's own weighing of the evidence. It also ignores the fact that there was far more to this record than the opinions of Ms. Knapp's family and friends.

Appellant argues the court should have recalled his indeterminate life term because of changes in the law that would have prevented him from being tried as an adult "if he had committed his crime today." Appellant relies on statutory amendments that went into effect in 2019 and barred the criminal prosecution of 15-year-old juveniles in adult court, and asserts the legislative changes recognized the developmental differences between juveniles and adults, and meant "his offense necessarily would have been adjudicated in juvenile court."

Appellant murdered his mother in 2001, and the legislative amendments did not go into effect until 2019, so he was not entitled to the benefit of any subsequent amendments. Moreover, appellant fails to acknowledge that shortly after he was charged with murder in 2001, he moved to be treated as a juvenile under the statutes in effect at that time. As explained in Part II., *ante*, the court conducted a fitness hearing and made detailed findings as to why appellant was unfit for treatment in the juvenile system based on evidence of his advanced planning to commit the murder, and "the evidence of his intelligence and sophistication and his maturity beyond his years …." While there were different statutory requirements in 2001, appellant was not automatically treated as an adult in this case and found unfit for juvenile proceedings based on the nature and circumstances of his own criminal conduct.

Next, appellant argues section 1170, subdivision (d)(1) recognizes any inmate has the capacity to change while incarcerated and, as a result, a court considering a recommendation for recall of sentence by CDCR may consider the postconviction factors listed in the statute. Appellant complains the court arbitrarily and indiscriminately ignored these factors when it denied his motion and argues the balance of those factors would have resulted in overwhelming evidence for the court to grant his motion for recall and resentencing.

As explained above, it appears section 1170, subdivision (d)(1) was amended in such a way so that the court only considers the postconviction factors after it decides whether to recall the sentence. Nevertheless, the court's lengthy ruling in this case clearly shows that it considered appellant's postconviction conduct when it evaluated the entirety of his motion. This evidence included his good behavior, extensive educational and counseling achievements, and personal recommendations from counselors and staff who had worked with him. The court also considered the Secretary's recommendation, CDCR's detailed Diagnostic Study and Report, the numerous supporting exhibits to his motion for recall, and the witnesses who testified on his behalf at the evidentiary hearing about their positive experiences and observations when they interacted with him in prison over the prior 17 years. The court did not discount this evidence or question the veracity of the witnesses who testified on his behalf.

Appellant complains the court should have placed greater emphasis on the post-conviction factors listed in subdivision (d)(1) and appellant's achievements since his incarceration instead of the facts and circumstances of his murder conviction. Appellant points out the district attorney failed to call witnesses who had any contact with him in the past 17 years to contradict his favorable evidence. Appellant argues the court's ruling presents "an almost textbook definition of 'arbitrary and capricious' " because it was based entirely on speculation by Ms. Knapp's relatives and friends about his character, even though they had no contact with appellant since 2001. Appellant also complains about the court's reliance on Ms. Schumacher's opinions because her testimony about his alleged mental health issues was entirely speculative because she never met with or evaluated him.

The court did not rely on speculative or irrelevant evidence when it denied appellant's motion, and instead decided the entirety of the evidence and overall circumstances did not justify recalling his sentence or placing him on probation before he was eligible for parole. The court acknowledged appellant's positive performance in

56.

prison and the "significant" evidence of his rehabilitation and stated that simply relying on the circumstances of the murder to deny the petition would not be in the "spirit" of the law. The court found it was "equally outside the spirit of the law to ignore the facts of the murder and the [appellant's] character at the time of the murder and only consider his conduct since the murder." The court was greatly concerned that appellant had not changed given the similarities in how people described him before the murder and after he had served 17 years in prison. "No one would have predicted what [appellant] would do to his mother that day, yet he did," and people stated at that time that his actions "were out of character. They may have been, but he still committed the murder." The court's discretionary ruling was not "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Appellant argues the record shows "the clash between substantial evidence and mere speculation" based on the contrary opinions from those "intimately familiar" from their personal interactions with him in prison, and those who had no contact with him for 17 years and operated "in an absolute vacuum of supporting evidence" that he was a risk to public safety.

In making these arguments, appellant cites to several examples of favorable evidence that the court failed to consider or give greater weight to. In doing so, however, appellant fails to account for inconsistencies between the trial record and the assertions in these proceedings. For example, appellant argues that based on Dr. Musacco's report filed in support of his motion for recall, "Dr. Musacco appeared to agree, or at least took no issue with the assessment of a prior psychiatrist that Mr. Chamberlin's *three-month use of anabolic steroids* as a high school athlete very shortly before the murder 'had overwhelmed his emotions and judgment, contributing to his offense behavior.' " (Italics added.)

The entirety of the record, however, is marked by inconsistencies in appellant's statements about the nature and extent of his alleged steroid use, and the issue was never

raised at trial or presented to the jury. During his interview with the detectives a few hours after the murder, appellant was asked if he used steroids. Appellant said he stopped using steroid pills three months before the murder, and injected steroids one time a few months before the murder.

The parties stipulated at appellant's jury trial his appellant's blood and urine samples, taken a few hours after the murder, were negative for steroids, alcohol, and narcotics. Dr. Musacco's reference to "a prior psychiatrist" is presumably to Dr. Bronner, who testified at the pretrial juvenile fitness hearing that appellant said he started using steroids in April 2001 and stopped around the first week of June 2001; and after 10 days, he started using again for about 10 more days, contradicting his statement to the detectives. Dr. Bronner acknowledged appellant's tests were negative for steroids, but believed anabolic steroids acted similar to cortical steroids, appellant's prior usage altered his metabolism, and he committed the murder while he was in a psychotic state precipitated by his steroid use. The court at the juvenile fitness hearing rejected Dr. Bronner's opinions as speculative.

At his jury trial, appellant did not move to introduce any expert testimony about his alleged steroid use, and he did not testify. In his motion for recall, however, appellant asserted his "heavy steroid use" overwhelmed his emotions and judgment and contributed to "damaging his young mind's ability to reason and think and ultimately control his emotions." At the evidentiary hearing on his motion, appellant testified that he used anabolic steroids for an 18-week period before the murder, he stopped using steroids about a month before the murder, and he believed it resulted in some of his impulsive decisions in the weeks before the murder.

Appellant's motion for recall stated that he took full responsibility for committing the murder, but also asserted his steroid use "contributed to damaging his young mind's ability to reason and think and ultimately control his emotions." However, appellant's attempt to rely on his alleged steroid use as a possible reason for the murder is

58.

undermined by his inconsistent statements about his usage. The superior court rejected it as a mitigating reason when it found he was unfit for juvenile proceedings, he never presented the issue to the jury and, most importantly, both his blood and urine samples taken a few hours after the murder were negative for steroids.

As another example, appellant cites to Detective Krueger's hearing testimony, that he confessed that he killed his mother "within three to five minutes after detectives pointed out inconsistencies in his story, and that they did not have to use subterfuge or lies to obtain that confession." Appellant fails to mention that when he called 911, he had a detailed story ready when the dispatcher asked what happened, and even said that the telephone in his mother's room did not work. The criminalist testified at trial that the telephone on the nightstand in Ms. Knapp's bedroom was not plugged into the electrical outlet and blood was smeared around the telephone's outlet plate, indicating it was unplugged during or after the attack. When the first officers arrived at the house, appellant repeated his story and provided additional details to explain the bloody towel in the trash can and the blood drops outside the house. When the detectives met him at the hospital and interviewed him for an hour, he repeated his detailed story about the male suspect, how he confronted and chased the suspect, that he picked up and then dropped the knife, why there were blood drops in the bathroom, and that he took off his sandals before he went into the house. The detectives continued the interview at the police department, and appellant again repeated his story. The detectives finally confronted him with inconsistencies in his account, but appellant stuck with his version of events until they told him that they knew he killed his mother. Appellant asked what would happen to him. Detective Adair asked if he killed her, and appellant said yes.

Detective Krueger testified at the evidentiary hearing in this case that a few minutes passed between the time the detectives confronted appellant with inconsistencies and asked if he killed his mother, and his ultimate confession. Prior to that, however, appellant spent several hours relating a detailed story that created an unknown male

59.

suspect and accounted for the physical evidence surrounding his mother's murder – the cut on his hand, the unplugged telephone in the bedroom, his sandals left at the backdoor, the bloody towel in the trash can, the blood drops in the bathroom and outside the house, and even the possibility that his fingerprints were on the knife.

Appellant also notes that he never required any mental health services while he was in prison. Ms. Schumacher, who testified for the prosecution but had not evaluated appellant, was surprised and concerned that appellant had never received individual counseling or tests that would better address his risk of reoffending, given his claims about the trauma resulting from his father's death and the nature of his crime. She believed the fact he never received any treatment indicated he was at high risk for reoffending.

Appellant asserts the court should not have relied on Ms. Schumacher's testimony and her opinions were irrelevant since she never evaluated him or reviewed his CDCR records. However, her opinion was based on appellant's own testimony at the evidentiary hearing, where he extensively discussed his emotional state when he was a teenager – he believed that he was not loved or valued within his family and he had to earn that love, and his sense of self was based on the validation of other people and not attached to anything authentic. "That belief system has its roots in my earliest childhood and sort of like how I related to my dad's addiction. I had internalized responsibility for his addiction." Appellant believed his father's addiction was his fault and that his recovery was also his responsibility. Appellant testified that every time his father used or "he was away from me and our family that he was making a choice of drugs over me," and he could remember "wanting him to love me and wanting him to choose our family." When his father died of a heroin overdose, he felt sadness and grief, but also felt "a lot of shame because his death, like, specifically in that manner was like the ultimate rejection of me." Ms. Schumacher's opinions were thus based on appellant's own description of

60.

his emotional state at the time of the murder and the references in his motion that he had never received any mental health treatment after he was convicted.

Finally, appellant relies on *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*) in support of his arguments that the postconviction factors should control this decision. The petitioner in *Lawrence* was convicted of first degree murder and sentenced to life. She was granted parole in her fourth appearance before the Board of Parole Hearings. In doing so, the Board "emphasized the presence of multiple statutory factors favoring suitability, including [her] exemplary record of rehabilitation, her acceptance of responsibility for the crime, her realistic parole plans, and her close ties to her family, who would offer her support in reintegrating into the community. [¶] The Governor, however, as he had done previously, found that the gravity of the commitment offense indicated petitioner remained unsuitable for parole, and reversed the Board's decision." (*Id*. at p. 1190.)

*Lawrence* vacated the Governor's order and reinstated the Board's parole decision. *Lawrence* held that "because *the core statutory determination* entrusted to the Board and the Governor is whether the inmate *poses a current threat to public safety*, the standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous.… In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1191, first italics added.) *Lawrence* concluded that based on the "some evidence" standard, the

record failed to support the Governor's conclusion that the defendant remained a current danger to public safety.  (*Ibid*.)

> "An evaluation of the circumstances of the crime in isolation allows a fact finder or reviewing court to determine whether a commitment offense was particularly egregious – a designation that we have seen applied in nearly every murder case considered by the Board or the Governor – and to conclude that the prisoner was a danger to the public *at or around the time of his or her commission of the offense.*  Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future.  **At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness.**"  (*Id*., at p. 1219, bold print added.)

Appellant acknowledges that *Lawrence* addressed parole proceedings but relies on the above quoted bold print language and argues it supports his argument that the court abused its discretion in this case by "misweighing the relevant factors overwhelmingly supporting CDCR's recommendation."  Appellant argues that *Lawrence* shows the court's "disproportionate reliance" on appellant's conduct " 'all those years ago' was not an accurate indicator of his current potential dangerousness, or lack thereof."

*Lawrence* does not support appellant's arguments because it addressed a completely different statutory scheme involving parole, the decisions made by the parole board, and the Governor's ability to reverse those decisions.  In contrast, appellant's motion sought recall of his indeterminate sentence while he was still serving it, and before he was even eligible for parole.  As explained above, the court was not statutorily required to consider the postconviction factors in section 1170, subdivision (d)(1) to decide whether to recall his sentence, but it did so, accepted the veracity of the evidence and testimony introduced about appellant's conduct in prison, and still decided that appellant's sentence should not be recalled based on the entirety of the circumstances.

**<u>DISPOSITION</u>**

The order is affirmed.

Appellant's request for judicial notice of the record in his prior appeal is granted.

Appellant's requests for judicial notice of two educational achievements that were not before the superior court are denied.

POOCHIGIAN, Acting P.J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.